Clarence HUFFMAN, Appellant,

v.

BOARD OF EDUCATION OF MO-
BRIDGE INDEPENDENT SCHOOL
DISTRICT NO. 13, WALWORTH
COUNTY, South Dakota, Respondent.

No. 12068.

Supreme Court of South Dakota.

April 27, 1978.

James Robbennolt, of Duncan, Olinger & Srstka, Pierre, for appellant.

Newell E. Krause, of Lakeman & Krause, Mobridge, for respondent.

WOLLMAN, Justice.

This is an appeal from a judgment of the circuit court that affirmed the decision of the Board of Education of Mobridge Independent School District No. 13 (the board) not to renew the teaching contract of Clarence Huffman (appellant). We reverse and remand.

Appellant was first employed by the board as a band instructor in 1967. His duties consisted of directing the senior high school concert band, the jazz ensemble, and the pep band. He was also responsible for individual and group lessons, team teaching, directing the elementary instrumental music program, administering the Region VI music contest, and administering All State Band auditions. In March of 1975, the board notified appellant of its intention not to renew his contract for the 1975–76 school year. At appellant's request, a hearing was held before the school board pursuant to SDCL 13–43–10.1. Appellant's request that a record be made of the evidence taken at that hearing and that the witnesses be sworn was denied. The board offered no testimony or evidence of any kind at the hearing. On April 17, 1975, the board issued its decision not to renew appellant's contract. Appellant appealed to the circuit court pursuant to SDCL 13–46–6, and in April of 1976 the matter was tried in the circuit court. The trial court found that the board's decision not to renew appellant's contract was based upon substantial evidence.

Before we proceed with our review of the evidence, we must determine what scope of review is proper in the light of the procedural aspects of this case. As noted above, the board submitted no evidence at the hearing afforded appellant pursuant to his request under SDCL 13–43–10.1. The board took the position, as it has on appeal, that so long as the reasons it advanced for not renewing appellant's contract were not trivial it was not required to submit any evidence in support of its decision. The question now is what effect the failure of the board to offer any evidence at that hearing had upon the circuit court's scope of review of the board's decision and, correspondingly, upon our scope of review of the circuit court's findings. The question of the applicable scope of review is of more than academic interest, for the "clearly erroneous" standard of review gives a reviewing court greater latitude in reviewing a lower court's findings than does the "substantial evidence" test. K. Davis, Administrative Law Treatise § 29.02 (1958). Professor Davis has categorized the several standards of review in the following terms:

"So when the 1970s began, the law was based upon the basic and universal understanding that of the three main formulas for review of findings of fact, the broadest judicial inquiry was under the clearly erroneous test, the next broadest was under the substantial evidence test, and the narrowest was under the arbitrary or capricious test." K. Davis, Administrative Law of the Seventies § 29.00, at 647 (1976).

In *Mortweet v. Ethan Board of Education*, S.D., 241 N.W.2d 580, and in *Collins v. Wakonda Independent School District No. 1*, S.D., 252 N.W.2d 646, we held that the trial de novo provided by SDCL 13–46–6 is not a trial de novo in the strictest sense of that term, but rather is a more limited type of hearing at which the circuit court hears evidence for the purpose of determining whether the school board was vested with discretion to make the decision considered on appeal, whether that discretion was exercised unreasonably or arbitrarily or was manifestly abused, and whether the decision was supported by substantial evidence.

■ We conclude that the trial court was free to make its own determination concerning the weight of the evidence and that we, in turn, may review the trial court's findings under the "clearly erroneous" test of SDCL 15–6–52(a) rather than under the more restrictive "substantial evidence" scope of review. This is the only conclusion that the *Mortweet* and *Collins* decisions admit of, for if we were to adopt the board's view that it was under no obligation to offer any evidence at the hearing held pursuant to SDCL 13–43–10.1, appellant would be subject to the restrictive "substantial evidence" scope of review on appeal to the circuit court under SDCL 13–46–6 when in fact the circuit court would not be reviewing evidence but would be considering it in a truly de novo manner. In essence, then, what the board contends for is the benefit of the limited scope of review established by the *Mortweet* and *Collins* cases without the concomitant burden that makes such review applicable. The board cannot have it both ways. Having elected to require the circuit court to afford appellant a trial de novo, it must now abide the consequences of having the trial court's findings reviewed under the more exacting standard of SDCL 15–6–52(a).

■ We turn, then, to a review of the evidence offered to justify the board's decision not to renew appellant's contract.

The board's decision was based upon the following reasons:

1. Low enrollment in the band program.

2. Poor instrumentation of the high school band.

3. Erratic pep band program for football, basketball and wrestling activities.

4. Improper use of junior high students in senior high band.

5. Poor attendance of students at regular band practices.

Notwithstanding this rather impressive list of deficiencies, the evidence submitted on behalf of the board was at best equivo-

cal. For example, one would expect that a band director whose performance over the period of eight years had resulted in a list of transgressions as lengthy as that set forth above would be the subject of a concerted action on the part of school administrators to terminate his employment posthaste. The fact is, however, that neither the superintendent of schools nor the senior high school principal intended to recommend that appellant's contract not be renewed prior to March 11, 1975, the date of the meeting at which the board reached a tentative decision not to renew appellant's contract for the coming year. It is true that the superintendent had felt some dissatisfaction with the attendance of the pep band members at certain of the athletic contests at which the pep band was to perform and that he and the principal had met with appellant in February of 1974 for the purpose of discussing band attendance and enrollment problems, but the fact remains that neither of these officials recommended that appellant's contract not be renewed. The evidence revealed that the Mobridge band had received "One" ratings at band contests during six out of the eight years that appellant had served as director. In 1974–75 the band received the highest rating for instrumentation at contest competition.

The person who had served as senior high school principal from 1970 through 1974 characterized appellant as a "very fair man" who seemed to get along with band members and who seemed to have no specific disciplinary problems. This witness had recommended appellant for renewal during each of the years 1970–74. The senior high school principal who had worked with appellant during the 1974–75 school year testified that in his opinion appellant was a dedicated teacher who approached his job with enthusiasm and who tried hard to do a good job.

Much of the evidence submitted on behalf of the board consisted of the testimony of board members. Apart from their general dissatisfaction with what they considered to be inadequate band enrollment for a school of the size of Mobridge and their complaints regarding the poor attendance of the members of the pep band, the board members' principal complaint concerned their dissatisfaction with the pep band's style of play. One board member summarized his criticism of the pep band by saying, "there's just no pep." Other board members characterized the pep band as not being peppy enough. The board members also expressed dissatisfaction with the failure of appellant to take the marching band on more road trips to events such as Hobo Day at South Dakota State University.

Appellant acknowledged that he had shared the concern of the superintendent and principal that the enrollment in the senior high school band was relatively low in comparison with that of surrounding schools. He explained the poor attendance at some of the pep band performances as stemming from the fact that a number of the band members had outside employment that precluded their attendance at evening functions, that eight of the girls in the pep band were also cheerleaders, and that two of the boys were members of the wrestling team. He testified that he had permitted the students to express their opinions on whether or not to attend functions such as Hobo Day. He acknowledged that the pep band was the weakest part of his total program.

Appellant offered the testimony of two band directors concerning the difficulties inherent in achieving adequate instrumentation in a high school band. For example, Orville Evenson, longtime band director in the Aberdeen public school system, testified that the instrumentation of the Mobridge High School Band was quite close to what other comparable schools in South Dakota were able to achieve. In discussing the difficulties of achieving proper instrumentation, Mr. Evenson gave as an example his recent experience in Aberdeen, a school several times the size of Mobridge High School. He pointed out the fact that whereas he had only two tuba players, he had thirty-one drummers, remarking somewhat plaintively, "[I]t's enough to make me cry. . . . What in the world am I going to do with thirty-one drummers."

In the same vein, the band director at Selby High School testified that it is difficult to achieve good instrumentation in a high school band. In his opinion, appellant had had good instrumentation in the Mobridge High School Band for the year 1974–75. This witness also testified that because many band members are involved in other activities such as cheerleading it is difficult to get proper instrumentation in a pep band. It was his opinion that in 1974–75 the Mobridge band "had a very good sound."

Several of appellant's fellow teachers described appellant as "super enthusiastic," "very cooperative," "very demanding," "very professional," "extraordinarily efficient," "one of the better motivators I ever met." Without exception they testified that appellant got along well with his students. The junior high school band director testified that appellant had made efforts to get junior high band students to continue into the senior high band program. In this regard, it is noteworthy that starting in 1975 the school adopted a program whereby students in grades nine through twelve were permitted to participate in the senior high school band, a policy that nearly all surrounding schools had had in effect for a number of years. During appellant's tenure at Mobridge, the senior high band was limited to members of grades ten through twelve.

A member of the senior high school band testified that appellant had tried to encourage students to attend band practice faithfully and to make up time on their own and that appellant had tried to get the students to participate as much as possible. A former band member described the point system that appellant had established to encourage band members to attend practices. Still another former band member testified that appellant had made a practice of having personal conferences with those band members whose attendance was poor and of notifying the parents of those students.

In a word, then, aside from the complaints by the board members concerning the funereal sound of the pep band's music, there was no evidence that the quality of the band program under appellant's leadership was other than excellent. Indeed, in view of the consistently superior ratings given to appellant's band by knowledgeable, disinterested critics, it is little wonder that the board had to rely upon the subjective evaluations of those persons who, by the tenor of their testimony, equated the importance of the band's function as a catalyst for spectator entertainment and enthusiasm at athletic contests and as a civic representative at out-of-town parades with its function as an educational and cultural experience for the members of the band.

True, there were problems with band attendance, although figures were introduced from which it could be concluded that attendance at band practices was no poorer than that in the classrooms generally. The lower proportion of band enrollment than that of surrounding schools with comparable school enrollments could very well have been attributable to the fact that during appellant's tenure the junior high school band was under the direction of someone other than appellant. As Mr. Evenson testified, the success of the senior high school band program depends upon the quality of the feeder program from the junior high school band. Indeed, the junior high school principal testified that commencing during the 1976–77 school year the senior high school band instructor would handle both the junior high school and grade school band programs.

If there is one thread that runs through our decisions that have interpreted the provisions of our continuing contract law, it is that the courts should show great deference to the good faith determinations of school district boards made upon the basis of competent, credible evidence. See *Goodwin v. Bennett County High School Independent School District*, 88 S.D. 639, 226 N.W.2d 166; *Schneider v. McLaughlin Independent School District*, S.D., 241 N.W.2d 574; *Mortweet v. Ethan Board of Education*, supra; *Collins v. Wakonda Independent School District No. 1*, supra. This deference is compelled by the language of SDCL

13-8-39, which provides that a school board shall have general charge, direction and management of the schools within the district. On the other hand, as we said in the *Collins* case, supra, "The purposes of the Continuing Contract Law are to provide teachers security in employment and to prevent dismissal of a teacher without cause." 252 N.W.2d 646, 647. It was to recognize and reconcile these sometimes competing interests that we adopted in the *Mortweet* and *Collins* cases as a limitation upon a school board's unfettered right to terminate a teacher's employment the requirements that the exercise of a board's discretion not to renew such employment not be exercised unreasonably or arbitrarily, or be manifestly abused, and that the board's decision be supported by substantial evidence.

As we have already stated, however, given the procedural status of this case we will apply a more wide-ranging scope of review to the evidence submitted in support of the board's decision. Although the board is quite right when it concedes that nonrenewal of a teacher's contract must be based upon more than trivial reasons, it fails to recognize that those reasons, however significant, must be supported by competent, credible evidence. Giving all due deference to the board's decision in the instant case, and without in any manner intending to depreciate or disparage the sincerity of the members of the board or the good faith of their determination that the quality of the instrumental music produced by the pep band was unsatisfactory and that the enrollment in or attendance at the band programs was below the level the board members felt was desirable, we conclude that the board did not carry its burden of supporting by adequate evidence the reasons given for the nonrenewal of appellant's contract. In reaching this conclusion, we find it noteworthy that not one of appellant's former band members, not one of his former co-workers, and not one non-board member parent was heard to voice any complaint concerning appellant's performance as band director. Cf. *Schneider v. McLaughlin Independent School District,* supra; *Mortweet v. Ethan Board of Educa-*

*tion,* supra. Although we do not mean to suggest that such evidence is a prerequisite to a valid nonrenewal under the continuing contract law, we find the absence of such evidence in the instant case to be of more than passing significance, especially in view of the fact that much of the board members' dissatisfaction with appellant's performance was based upon their inherently subjective and nebulous criticism of the style and tempo of the pep band's play.

■ There remains the question of the ultimate disposition of this appeal. SDCL 13-46-6 provides that upon the trial in the circuit court on an appeal from the decision of a school board "the court shall enter such final judgment or order as the circumstances and every right of the case may require . . . ." At the time of the trial in the circuit court, appellant was employed as an instrumental music teacher in Sterling, Colorado, at a salary of some $11,325. At the time of his nonrenewal in April of 1975, appellant was receiving a salary of $12,300 and, according to appellant's testimony, would have received a salary of some $13,250 had his contract been renewed for the 1975-76 school year. Because the board has long since employed a replacement for appellant and because appellant has left the state to secure other employment, the reinstatement of appellant to his former position would not seem to be a practical remedy. Whether the record is sufficiently clear to enable the circuit court to fashion a remedy by way of entering a money judgment for any damages appellant may have suffered as a result of the wrongful nonrenewal of his contract or whether additional testimony will be needed on this issue, we leave to the sound discretion of the trial court.

The judgment is reversed and the case is remanded to the circuit court for further proceedings not inconsistent with this opinion.

All the Justices concur.