**Tom REID, Appellant and Appellee,**

v.

**HURON BOARD OF EDUCATION, HURON SCHOOL DISTRICT NO. 2-2, Respondent and Appellant.**

Nos. 16514, 16525.

Supreme Court of South Dakota.

Argued Sept. 12, 1989.

Decided Dec. 6, 1989.

Linda Lea Viken of Finch, Viken, Viken & Pechota, Rapid City, for appellant and appellee.

Rodney Freeman, Jr. of Churchill, Manolis, Freeman & Kludt, Huron, for respondent and appellant.

MORGAN, Justice.

The Board of Education of the Huron School District (Board) appeals from a judgment reinstating Tom Reid (Reid) as the Huron High School boys' varsity basketball coach. By notice of review, Reid appeals that part of the trial court's order holding that the Continuing Contract Law (CCL), SDCL 13-43-9.1 through 13-43-13, does not apply to the coaching portions of a teacher's contract. We affirm the decision of the trial court for a different reason.

Reid is a tenured teacher who had been employed by Board for seven years. He was first employed by Board at the commencement of the 1982-83 school year. In addition to teaching ninth grade physical education and physical science, he was also the Huron High School boys' varsity basketball coach for seven years. Reid holds a valid South Dakota teaching certificate as required by SDCL 13-42-1. He is certified to teach all subjects within his areas of academic preparation, as well as an assignment outside his major areas of academic preparation: head coach.

March 21, 1988, was the third Monday in March, the deadline under SDCL 13-43-9.1 for Board to notify teachers of their intent to nonrenew their contracts. Despite the fact that Huron's varsity basketball season was completed by March 14, 1988, Reid was not notified on March 21, 1988, that the basketball coaching portion of his teaching contract would not be renewed.

Instead, on April 5, 1988, Reid was handed his 1988 coaching assessment evaluation by Barry Huitema (Huitema), Huron's Athletic Director, and was advised by Huitema that he was recommending to Board that they not offer Reid the head coaching

duties for the year 1988–89. Reid was given twenty-four hours to reply to the 1988 coaching assessment evaluation. Huitema also informed Reid he could visit with Superintendent Robert Taylor and meet with Board, but Reid declined to do so on advice of counsel.

On April 19, 1988, Board held a special meeting and voted to accept Huitema's recommendation that Reid not be offered the basketball coaching assignment for 1988–89 school year. Though Board had all the evaluations of Reid's coaching from 1983 through 1988, as well as Reid's responses and the plan of assistance prepared by Huitema, they did not look at these documents, nor did they ask Huitema any questions or have any discussion on the issue of nonrenewal of Reid's coaching contract. Board relied exclusively on Huitema's recommendation. Under Reid's 1987–88 teaching contract, he was paid $22,822. Board's nonrenewal of the head basketball coaching job meant a $2,474.00 reduction in pay, a nearly eleven percent cut in Reid's teacher salary.

Reid appealed to the circuit court and a trial de novo was held, pursuant to SDCL 13–46–1. By stipulation of fact, both parties agreed that Reid was not given notice by the third Monday in March, 1988, that the portion of his teaching contract effecting his head coaching duties would not be renewed.

At trial, Huitema was unable to give a principal reason for recommending nonrenewal. He expressed his general concern, however, with the roller-coaster pattern of Reid's performance and evaluations from year to year. Despite this pattern, Huitema had recommended renewal of Reid's contract the previous six years. He also admitted that Reid was "a very good fundamentalist; his strengths being teaching skills, ball handling, and shooting." Further, testimony from Board President Ruth Sievert (Sievert) and Superintendent Taylor established that Board's decision to nonrenew the basketball coaching portion of Reid's contract was based solely on Huitema's recommendation and without any independent inquiry on the part of Board.

Sievert did claim that she and Board had a generalized knowledge of the problems with Reid's coaching.

Reid offered evidence for the source of some of this negative information as being Board member Bill Eichman (Eichman). During the 1987–88 season, Reid had a confrontation with Eichman over who should coach the team. Reid sent Eichman a letter requesting that he stop interfering with the team because it was effecting player morale. Eichman's actions included the following: embarrassing one of the players by offering to buy him black basketball shoes (the team's colors are orange and black) and have him work off the debt for Eichman; offering to buy the coaches sport coats, though these items of clothing were not required in the dress code; commenting to parents that certain players were ball hogging and the coaches were not coaching properly; and, most critically, attending practice sessions, making notes, and then informing players of their mistakes. Reid's letter concluded by informing Eichman that he, and not Eichman, was hired to coach the basketball team. It was Eichman who had made the motion to dismiss Reid as head coach, which motion carried on a voice vote.

The trial court found that the CCL did not apply to the coaching provisions of Reid's contract. Nonetheless, it found Board's decision to nonrenew was arbitrary and characterized by an abuse of discretion under the provisions of SDCL 1–26–36(6), because Board abdicated its responsibility by relying on the recommendation of Huitema, instead of making an independent inquiry into the facts. The trial court ordered reinstatement of Reid as head basketball coach and compensation in the sum of $2,474.00, plus any prejudgment interest and costs.

On appeal, Board raises three issues:

(1) Whether the decision to nonrenew the coaching portion of Reid's contract was arbitrary and characterized by an abuse of discretion;

(2) Whether the trial court abused its discretion in failing to grant Board's motion for a new trial; and

(3) Whether Reid's proper remedy is reinstatement as head basketball coach or simply damages.

By notice of review, Reid raises the key issue:

Whether the trial court's finding that the Continuing Contract Law does not apply to the coaching portion of a teacher's contract was clearly erroneous.

Since the applicability of the CCL to coaching is pivotal to the outcome of this case, we begin with the notice of review issue. Reid argues that because South Dakota law defines a coach as a "teacher" and the CCL requires that a "teacher" be notified when the terms and conditions of his contract are changed, the coaching portion of his contract was covered by the CCL. Further, he contends that since Board did not notify him of the change in the terms of his contract by the third Monday in March, his contract was automatically renewed.

Board, in response, argues that it would be impractical to apply the CCL to springtime extracurricular activities; therefore, the legislature did not intend for it to apply to coaching duties. Additionally, Board contends that case law from this state, and others, supports the proposition that the coaching provisions of a teacher's contract are not covered by the CCL.

We premise our discussion on several well-settled rules of statutory construction, starting with the rule that construction of a statute is a question of law and thus the decision below is fully reviewable without deference to the decision of the trial court. *Petition of Famous Brands, Inc.*, 347 N.W.2d 882, 884 (S.D.1984). In *Famous Brands* we also said:

The purpose of rules regarding the construction of statutes is to discover the true intention of the law, and said intention is to be ascertained by the court primarily from the language expressed in the statute. (cite omitted).

In applying legislative enactments, we must accept them as written. The legislative intent is determined from what the legislature said, rather than from what we or others think it should have said. (cite omitted).

While it is fundamental that we must strive to ascertain the real intention of the lawmakers, it is equally fundamental that we must confine ourselves to the intention as expressed in the language used.

*Id.* at 884–5.

SDCL ch. 13–43 encompasses employment of teachers and, as previously noted, SDCL 13–43–9.1 to 13–43–12 inclusive, comprise the CCL. For the purpose of the CCL, "teacher" is defined in SDCL 13–43–12 to mean any person engaged in the profession of teaching children, grades kindergarten through twelve, in the public schools of South Dakota and any person employed in the public schools as a principal, superintendent or other administrative school employee. SDCL 13–43–4 requires a written teacher's contract and SDCL 13–43–5, except in circumstances not applicable in this discussion, requires a teacher's certificate before such a contract can be signed.

Pertinent to our discussion whether coaching is covered under this definition, we must turn to the certification statutes. SDCL ch. 13–42 relates to teacher certification. SDCL 13–42–1 provides that no person shall be allowed to teach or administer "who does not have a valid certificate issued by the superintendent of elementary and secondary education authorizing said person to teach." SDCL 13–1–11 empowers the state board of education to make all rules carrying out supervisory functions as relates to elementary and secondary education. And, in particular, SDCL 13–42–3 provides, in pertinent part: "The South Dakota Board of Education may determine and prescribe all rules and requirements which an applicant must meet in order to be issued a teacher's certificate by the Superintendent of Education authorizing the holder thereof to accept a teaching or administrative position in any elementary or secondary school in the field specified in the ... certificate." SDCL 13–43–5 provides, in pertinent part: "A teacher shall ... sign a contract only upon exhibition of

a certificate valid to teach the courses and grades in a school contemplated under the said contract and to qualify such school for accreditation." We read these statutes to say that the State Board of Education determines what a teacher must be "certified" to "teach."

The administrative rules promulgated by the State Board of Education set out the certification requirements for teachers. ARSD Chapter 24:02:01 is titled Requirements for Certification. ARSD 24:02:01:09 entitled *Teaching Assignment Outside Major Areas of Academic Preparation–Exceptions*, reads as follows:

Teaching assignments outside major areas of academic preparation require the following minimum preparation:[1]

. . . .

(12) A coach:

. . . .

(b) A head coach in grades 9–12, a basic elementary or secondary teaching certificate and at least one course in the care and prevention of athletic injuries and one course in the athletic activity coached[.]

In *Schnabel v. Alcester School Dist. No. 61–1*, 295 N.W.2d 340, 341 (S.D.1980), this court held that administrative rules were as binding as laws: "Generally, rules and regulations of an administrative agency governing proceedings before it, duly adopted and within the authority of the agency are binding as if they were statutes enacted by the legislature." *See Ward v. Viborg Sch. Dist. No. 60–5.*, 319 N.W.2d 502 (S.D.1982). In *Hartpence v. Youth Forestry Camp*, 325 N.W.2d 292, 295 (S.D. 1982), we held that the same rules on statutory construction apply to administrative rules and regulations, requiring us to give effect to all provisions. The rules promulgated for certification to teach outside a major area of academic preparation were clearly within the agency's authority. *Schnabel, supra.*

Reading the statutes and duly adopted administrative rules together, as we must, it is clear that to qualify as a head coach, which is listed under the certification rule as a "teaching assignment," one has to meet the certification requirements; a person certified is a "teacher"; and a teacher is entitled to the benefits of the CCL. Reid was certified as a head coach and entitled to receive the notice provided in SDCL 13–43–9.1. He did not receive this notice and, as such, his contract was automatically renewed. SDCL 13–43–10.

Aside from the statutory authority for this position, it also makes common sense. How can the physical education teacher instructing students on basketball in gym class be a teacher, yet the coach instructing student/athletes on the same subject after school is not? The Huron High School Coaches Handbook recognizes as much in its Statement of Philosophy: "Among the most valuable contributions of athletics are the *development of good sportsmanship, learning to win with dignity*, as well as the *education one can gain from a loss*, and the *development of pride in the school and community.*" (Emphasis in original.) These are the ultimate life skills we want our young people taught, whether in a classroom or on the playing field or on a basketball court.

Therefore, we hold that the trial court's finding that the coaching provisions of Reid's contract were not covered under the CCL was in error.

Nor are we dissuaded by Board's impracticality arguments. Related to the specifics of this case, there is nothing that would have prevented Board from giving Reid the notice required by SDCL 13–43–9.1. Huron High School's basketball season was completed on March 14, 1988, a week before the statutory deadline for the required notice.

1. The teacher certification requirements encompass other extracurricular activities such as speech, debate, drama, journalism, and music. These areas are also covered under the Continuing Contract Law. We note, however, that exceptions are granted in coaching, debate, journalism, oral interpretation, dramatics, vocal music and individual music for a non-teacher to assist in these areas if they are supervised by a teacher. These non-teachers are not covered under the Continuing Contract Law.

Board makes a legislative intent argument in broad terms of impracticality. It contends that the legislature could not have meant for the CCL to apply to extracurricular activities, especially coaching, because some sports, such as golf and track, are not completed before the deadline for notice of nonrenewal. This ignores the rather obvious fact that teachers in academic subjects teach for approximately two months beyond the nonrenewal date and are not evaluated for this period after nonrenewal, yet our school systems continue to function normally. We see no reason why coaches cannot be judged on the same partial period of time. We reject Board's argument that notifying a coach of nonrenewal during a season would harm team morale. Boards of education notify other teachers of nonrenewal of their contracts with no apparent qualms about dropping student morale. Board's argument concerning the effect on student/athlete morale is purely conjectural. While we are not totally unsympathic to Board's concerns, if the legislature truly did not intend for coaching and/or extracurricular activities to be covered by the CCL, they, and not this court, should be the ones to amend the law.

Nothing in our opinion prevents boards of education from nonrenewing the extracurricular portions of a teacher's contract if they follow the procedural and substantive rights provisions of the CCL. All we are saying is that if a board chooses to nonrenew that portion of the teaching contract, it must give the teacher the statutory notice, and the reasons for nonrenewal must not be arbitrary and capricious.

Having addressed Board's practicality concerns, we move to its legal arguments. The trial court relied on *Goodwin v. Bennett County High Sch. Ind. Sch. D.*, 88 S.D. 639, 226 N.W.2d 166 (1975), and *Nelson v. Doland Bd. of Educ. of Doland Sch.*, 380 N.W.2d 665 (S.D.1986), for the proposition that our CCL does not cover the coaching portion of a teacher's contract. In addition, Board cites several cases from other jurisdictions holding that coaching is not covered by those states' tenure or continuing contract laws. Every one of these cases is distinguishable from the facts at hand.

In *Goodwin*, a coach was merely reassigned to different coaching duties without a cut in pay. Here, Reid lost $2,474.00 when the coaching position in his contract was nonrenewed. Clearly, a significant monetary term of his contract was altered. *See Ward, supra* (significant cut in pay effects terms of contract and requires notice). Most significantly, however, *Goodwin* was decided before the passage of ARSD 24:02:01:09(12), defining coaching as teaching.

*Nelson, supra,* is totally inapplicable in that it merely held that an amendment to a third grade teacher's contract requiring certification was not a change in terms and conditions of the contract, but merely a requirement for compliance with certification statutes. Reid's certification to act as head coach was never at issue.

Board's reliance on other states' decisions that coaching is not teaching must be examined in the light of the specifics of those states' tenure or continuing contract laws. The salient fact that distinguishes all of these cases from the one at hand is that none of these states' rules, laws, or regulations define coaching as teaching as does our ARSD 24:02:01:09. *Neal v. School Dist. of York*, 205 Neb. 558, 288 N.W.2d 725 (1980) (statutes containing the duties of a teacher in school systems do not list coaching among those recognized); *Chiodo v. Board of Educ. of Spec. Sch. Dist. No. 1.*, 298 Minn. 380, 215 N.W.2d 806 (1974) (coaching not expressly included in statute, so not covered under continuing contract law); *State v. Smith*, 142 So.2d 767 (Fla.App.1962) (rules and regulations of the state did not certify coaching as a position held by a teacher).

Board puts particular emphasis on a line of North Dakota cases holding that extracurricular activities such as coaching are not covered under that state's continuing contract law. At first blush, these cases seem appealing because North Dakota's statutory provisions are similar to many of the provisions of our law. But on a closer

analysis, one finds that these cases are distinguishable as well.

In *Enstad v. N. Cent. of Barnes Public Sch. Dist. No. 65*, 268 N.W.2d 126 (N.D. 1978), a tenured teacher who taught English, physical education, coached girls' track and supervised the cheerleaders and pompom girls was offered a new contract that additionally required her to coach girls' basketball. The teacher claimed the addition of coaching duties changed a term in her contract. Enstad based her refusal to accept the new contract solely on her assertion that she was not qualified to coach girls' basketball. The court disagreed, stating: "Enstad does not contend that the offer of reemployment was unreasonable for reasons such as that it imposed an excessive work load or time demand upon her, that it *involved inadequate compensation,*[2] or that it was made in bad faith." *Id.* at 134 (emphasis added). More significantly, the *Enstad* court made it clear that *North Dakota had no department of public instruction requirements with regard to coaching.* The court stated: "Perhaps there will be a time in the future when accredited high schools in this state, by legislative mandate, will be required to hire high school athletic coaches possessing specific qualifications[.]" *Id.* at 135.

That time came in South Dakota in 1986 with the enactment of ARSD 24:02:01:09(12). Our administrative rule not only defines coaching as teaching, but requires head coaches to "hold a basic elementary or secondary teaching certificate and have at least one course in the care and prevention of athletic injuries and one course in the athletic activity coached."

Board also cites us to the very recent North Dakota case of *Coles v. Glenburn Public School D. 26*, 436 N.W.2d 262 (N.D. 1989), claiming its holding is on point with this case. We disagree. *Coles* involved two teachers, Coles, whose contract was non-renewed as to his position as athletic director and head basketball coach, and

Kuznia, whose contract was nonrenewed as to her position of girls' volleyball coach. Because it determined that Coles' duties as athletic director were so intertwined with his curricular duties, the North Dakota Supreme Court held that North Dakota's continuing contract law did apply to the athletic director's job, but not to the coaching positions of either teacher's contract, relying primarily on the *Enstad* decision.

Again, *Coles* points out that North Dakota statutes have never defined a coach as a teacher and, therefore, the coaching portions of the contracts are not covered under the continuing contract law. To buttress this position, *Coles* cites cases from Nebraska and Minnesota, including *Neal* and *Chiodo*, that say coaching is not defined as teaching in those states. We have previously distinguished those cases based on our administrative rules specifically defining coaching as teaching.

 Finally, we address Board's argument that money damages, not reinstatement, is the proper remedy. Board argues that reinstatement of Reid is an order for specific performance of a personal services contract, prohibited by SDCL 21–9–2. We specifically answered Board's objections to reinstatement being a proper remedy in *Jager v. Ramona Board of Education*, 444 N.W.2d 21, 27–28 (S.D.1989). Reid's contract was automatically renewed by failure to follow the notice provisions in SDCL 13–43–9.1. No breach of contract occurred during the life of the contract, so the trial court did not have to concern itself with orders for specific performance, mutuality of remedy, or direct enforcement by means of injunction or mandamus. *Jager, supra.*

Though *Jager* answered the general question of whether reinstatement is a proper remedy, it did not address the question of reinstatement to a particular position. Our opinion in *Goodwin, supra,* would seem to suggest that the trial court erred in reinstating Reid to the head coaching position. *Goodwin* held there was no violation of the CCL where a coach was

---

2. The change in Reid's contract obviously altered a significant monetary term, leaving him with "inadequate compensation."

reassigned different coaching duties without a cut in pay. But *Goodwin* must be read in light of the amendments and modifications occurring thereafter. First, we effectively modified *Goodwin* two years later in *Collins v. Wakonda Ind. School Dist. No. 1*, 252 N.W.2d 646 (S.D.1977), where we said: "Moreover, the position offered in the new contract must not be a demotion as compared to the teaching position held under the existing contract." *Id.* at 648. Second of all, as we have previously noted, "coaching" and "head coaching" are particularly certifiable positions with stated requisites. Paying Reid his lost salary and assigning him other coaching duties would be a demotion. *Collins, supra*. We do not find that the trial court was clearly erroneous in reinstating Reid to the head coaching job.[3]

Since Board concedes that if the CCL applies to this case it failed to meet its obligations under the law, its issue concerning a new trial is moot.

We reverse the trial court's decision as to the CCL not applying to coaches and other extracurricular activities, and uphold its finding as to reinstatement of Reid as head boys' basketball coach, its award of $2,477.00 plus any prejudgment interest and costs, and its denial of Board's motion for a new trial.

We affirm the decision of the trial court to reinstate Reid for all the reasons hereinbefore set out.

SABERS, J., and STEELE, Circuit Judge, concur.

HENDERSON, J., concurs specially.

MILLER, J., concurs in result without writing.

STEELE, Circuit Judge, sitting for WUEST, C.J., disqualified.

HENDERSON, Justice (specially concurring).

I once read that the thoughts imparted by a teacher affects eternity because it can never be determined where his or her influence stops. A coach's influence on a young athlete is never ending. It lives on with the young athlete throughout his lifetime. Lessons learned on the playing field and the counsel of a coach abides in the mind and spirit throughout a young athlete's lifetime and it is called upon to use judgment and display courage in the many adversities found in life. If there is a difference between a "coach" and a "teacher", it must be a nebulous distinction which only lawyers and judges can formulate through legal jargon. A coach's activities with young students are, inherently, educational in nature. Though sports today have evolved, at some levels, into big time business with an overlay of preposterously high salaries and drug addiction, ancient games of athletics in Greece and Rome were based upon the development and elevation of the soul, mind and body.

Coaching certainly should be elevated, not only professionally, but in the eyes of the Law. It appears that ARSD 24:02:01:09(12) specifically honed in on "coaching" as being "teaching" and made specific reference to head coaches, such as, Coach Reid. On this Court, we must concern ourselves, as Justice Morgan has pointed out, with the law and administrative regulations pertinent thereto, and not be bound, in effect, by decisions of other courts in our sister states.

This administrative rule was enacted in 1986 and becomes more powerful, in law, than our *Goodwin* and *Nelson* decisions. *Goodwin* was handed down in 1975 and the *Nelson* opinion was filed in 1986. *Goodwin* was modified by this Court in 1977 in *Collins*. We cannot bend, in this Court, the intent of the legislature or the enactment of rules and regulations thereunder, to our will. We owe duty to honor an administrative regulation where it is straightforward, unambiguous, and not in conflict with the source statute.

---

**3.** Board hired another coach to be the head coach of the basketball team. Knowing that the trial court had ruled against its position, Board proceeded at its own peril. Reid should not be punished for Board's improper action. Therefore, it will be necessary to reinstate Reid in his position.

Under the provisions of the Continuing Contract Law, SDCL 13–43–9.1, *et seq.*, this Court must first ask the question with reference to the board of education's non-renewal decision: Did the board comply with the procedural requirements of the Continuing Contract Law? *Moran v. Rapid City Area School Dist. No. 51–4*, 281 N.W.2d 595, 598 (S.D.1979). Secondly, per *Moran*, the board's decision must be examined to determine if the decision was arbitrary, capricious or an abuse of discretion.

I would never reach the second issue and would base this Court's decision solely on issue one.* Indeed, the board failed to comply with the procedural requirements of the Continuing Contract Law and stipulated that Coach Reid was not given notice by the third Monday in March, 1988. He was never told, as required by state law, that his position as varsity boy's basketball coach would not be renewed.

Attached hereto, and by this reference made a part hereof, is the pertinent "TEACHER'S CONTRACT". Can we not read that the Huron School District called it a *"TEACHER'S CONTRACT"*? (emphasis supplied mine). Note the 1987 contract, labeled "Exhibit A", does not specify "extra-curricular activities" nor does it mention "assignment"; rather, it refers to a *"TEACHER'S CONTRACT"* and that he, Coach Reid, did "accept the *position*". Note that the 1988 contract, labeled "Exhibit B", (not signed by Coach Reid or the board) eliminated the varsity boy's basketball coach "position" and would change his secondary duty from "assistant varsity football" to "sophomore football coaching". Huron School District's position was clear: To cut his salary and demote his professional status. This it could not do for it failed to give notice by the third Monday in March, 1988, as required by the Continuing Contract Law. SDCL 13–43–9.1. Hence, Coach Reid was entitled to the contract as

reflected by "Exhibit A" and not "Exhibit B", i.e., *an automatic renewal* of the 1987 contract as it explicitly was worded.

Surely, with the many school districts in this state, there are differences in wording of teachers' contracts. If a school district wishes to preserve a certain degree of elasticity, it would seem that a contract specifically set forth that which constitutes "classroom teaching" or "teaching" from "additional assignments" or "extra-curricular activities".

I generally agree with Justice Morgan's writing and wish to confine this Court's decision to the facts at hand. The critical facts are that the school board is bound by its former contract, *exactly* as signed by the board and the teacher on April 1, 1987, for the year, 1988, because of the school board's failure to give notice, as required by this state's statute. For my part, I do not desire that school boards in this state be hampered in specifying that a teacher has certain "teaching duties" and other "assignments". "Assignments" of "extra-curricular activities" should not, per se, in my opinion, be squarely applicable within South Dakota's Continuing Contract Law. Here, the contract was quite specific as to Coach Reid's duties and an exact sum of money was specified for his performance of same. I would not negate the authority of the boards of education to direct and manage the schools but would assuage that each board must be very meticulous in their contracts for form contracts can only produce confusion, expense and litigation.

SDCL 13–46–6 empowers trial courts to enter final judgments, in cases such as we see before us, "As the circumstances and every right of the case may require ...". That statute, augmented by our holding in *Sutera v. Sully Buttes Bd. of Educ.*, 351 N.W.2d 457 (S.D.1984) and, as further approved in *Jager v. Ramona Bd. of Ed., Ramona School District*, 444 N.W.2d 21

---

* This Court can affirm the trial court where it has a right result for the wrong reason. *Seymour v. Western Dakota Vocational Technical Institute*, 419 N.W.2d 206 (S.D.1988); *Western Air Lines, Inc. v. Hughes County*, 372 N.W.2d 106 (S.D.1985); *South Dakota Medical Service, Inc.*

*v. Minnesota Mut. Fire & Cas. Co.*, 303 N.W.2d 358 (S.D.1981); *Owens v. City of Beresford*, 87 S.D. 8, 201 N.W.2d 890 (1972); *Northwestern Nat. Bank of Sioux Falls v. Gillis*, 82 S.D. 457, 148 N.W.2d 293 (1967).

(S.D.1989), justifies the reinstatement of coach Reid, the damages, prejudgment interest and costs as announced in the penultimate paragraph of the majority decision.

APPENDIX

( TEACHER'S CONTRACT

Huron School District No. 2-2, Huron, South Dakota

*A*

TOM REID ........................................................ April 1 , 198 7 .....

YOU ARE HEREBY OFFICIALLY NOTIFIED, That you have been elected as ...............................

.................. A TEACHER & DIRECTOR OF ACTIVITIES AS LISTED ...................... in the Huron School District No. 2-2, whose address is City of Huron on the annual salary basis of

$ 23,822* .... for the school term, or the remaining part thereof, of the designated number of teaching days,

Inclusive of days arranged for pre-school planning, beginning Approx. 9/2/87 ........ and subject to the calendar, or modifications of the same, as adopted by the Board of Education. The salary is to be paid the twentieth day of each of the twelve calendar months.

Your election is subject to the school laws of the State of South Dakota and to the salary schedule and contractual elements rules and regulations of the Board of Education of the Huron School District No. 2-2, which are hereby by reference, incorporated in and made a part of this contract as though set forth herein at length, subject to the right of said Board to terminate the contract for cause, to be determined upon by the Board, and subject to your right to resign upon giving thirty (30) days notice thereof, in writing to said Board

prior to May 15, 198. 7 ....

It is further contracted and agreed that your failure to complete the term of teaching prescribed herein for any cause, including but not limited to dismissal or resignation, constitutes a financial damage to the Huron School District No. 2-2 and that from the nature of the case it might be impractical or difficult to fix the actual damage.

THEREFORE, it is understood and agreed that your failure to complete the term provided herein shall result in

the following liquidated damages: failures occuring May 15, 198. 7 . through June 30, 198. 7 ..,$100.00;

July 1, 1987 ... through August 31, 198. 7 . $200.00; commencing September 1, 198. 7 . and for the duration of

the term, $350.00.

It is further understood and agreed that resignations shall not become effective until approved by the Board of Education at their next meeting following receipt of said resignation. Further, it is hereby agreed that you will pay to the Huron School District No. 2-2, or the Huron School District No. 2-2, will withhold or appropriate from any monies owed by them to you, and you hereby authorize such withholding or appropriation, the appropriate sum herein above set forth as liquidated damages due to your failure to complete said term.

This agreement becomes a binding contract when signed by the teacher and the Board of Education.

BA+30 Step 8--*The above salary includes $2474 (ES-5) for varsity boys basketball and $1428 (ES-5) for varsity assistant football

SCHOOL DISTRICT NO. 2-2 OF THE
CITY OF HURON, BEADLE COUNTY, SOUTH DAKOTA

ATTEST:

.......................................... By ..............................................
Clerk of School District Board Chairman of School District Board

TO THE BOARD OF EDUCATION OF THE HURON SCHOOL DISTRICT NO. 2-2
CITY OF HURON, BEADLE COUNTY, SOUTH DAKOTA

I hereby accept the position mentioned in the foregoing contract of hiring in the Public Schools of Huron, South Dakota, at the salary and upon and under the terms and conditions of the above and foregoing contract and have carefully read said contract and am fully informed as to the contents. I agree to attend such pre-school planning days as are scheduled exclusive of the designated number of teaching days.

Witness my hand this 13th day of April

Witness: .......................................... Sign here: ..............................................
 Teacher

**250** 

## ( TEACHER'S CONTRACT (

**Huron School District No. 2-2, Huron, South Dakota**

*(circular stamp: RECEIVED APR 1988 SOME S.D. APR 2 198 8)*

β

...TOM REID...................................................

YOU ARE HEREBY OFFICIALLY NOTIFIED, That you have been elected as ...................................

...........A TEACHER & DIRECTOR OF ACTIVITY AS LISTED BELOW......................
in the Huron School District No. 2-2, whose address is City of Huron on the annual salary basis of

$...23,204*...for the school term, or the remaining part thereof, of the designated number of teaching days,

inclusive of days arranged for pre-school planning, beginning.......Aug. 30, 1988...and subject to the calendar, or modifications of the same, as adopted by the Board of Education. The salary is to be paid the twentieth day of each of the twelve calendar months.

Your election is subject to the school laws of the State of South Dakota and to the salary schedule and contractual elements rules and regulations of the Board of Education of the Huron School District No. 2-2, which are hereby by reference, incorporated in and made a part of this contract as though set forth herein at length, subject to the right of said Board to terminate the contract for cause, to be determined upon by the Board, and subject to your right to resign upon giving thirty (30) days notice thereof, in writing to said Board

prior to May 15, 198. . 8 ...

It is further contracted and agreed that your failure to complete the term of teaching prescribed herein for any cause, including but not limited to dismissal or resignation, constitutes a financial damage to the Huron School District No. 2-2 and that from the nature of the case it might be impractical or difficult to fix the actual damage.

THEREFORE, it is understood and agreed that your failure to complete the term provided herein shall result in

the following liquidated damages: failures occuring May 15, 198. . 8 . through June 30, 198. . . 8 ., $250.00;

July 1, 198. . 8 through August 31, 198. . 8 $350.00; commencing September 1, 198. . 8 and for the duration of

the term, $500.00.

It is further understood and agreed that resignations shall not become effective until approved by the Board of Education at their next meeting following receipt of said resignation. Further, it is hereby agreed that you will pay to the Huron School District No. 2-2, or the Huron School District No. 2-2, will withhold or appropriate from any monies owed by them to you, and you hereby authorize such withholding or appropriation, the appropriate sum herein above set forth as liquidated damages due to your failure to complete said term.

This agreement becomes a binding contract when signed by the teacher and the Board of Education.
BA Step 5.3/69 Units--*The above salary includes $1571 (ES-6) for sophomore football coaching

SCHOOL DISTRICT NO. 2-2 OF THE
CITY OF HURON, BEADLE COUNTY, SOUTH DAKOTA

ATTEST:

.................................................By .................................................. .......
Business Manager of the School District Chairman of School District Board

TO THE BOARD OF EDUCATION OF THE HURON SCHOOL DISTRICT NO. 2-2
CITY OF HURON, BEADLE COUNTY, SOUTH DAKOTA

I hereby accept the position mentioned in the foregoing contract of hiring in the Public Schools of Huron, South Dakota, at the salary and upon and under the terms and conditions of the above and foregoing contract and have carefully read said contract and am fully informed as to the contents. I agree to attend such pre-school planning days as are scheduled exclusive of the designated number of teaching days.

Witness my hand this.............day of............

Sign here: .................................................
Witness:....................................... Teacher